# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

JESSE F. NORMAN II,                 )
                        Plaintiff,       )
                                    )
               v.                   )   Case No.:  2:09-cv-164
                                    )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security,     )
                                    )
                    Defendant.     )

## OPINION AND ORDER

This matter is before the court on the plaintiff's petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Jesse F. Norman II, on June 10, 2009.  For the reasons set forth below, the decision of the Commissioner is **AFFIRMED**.

### Background

The plaintiff, Jesse F. Norman II, applied for Supplemental Security Income ("SSI") on June 2, 2006, alleging an onset date of his disability of January 17, 2005.  (R. at 124)  His application initially was denied on October 13, 2006, and denied again upon reconsideration on February 26, 2007.  (R. 75-77, 85-86)  Norman filed a request for a hearing before an Administrative Law Judge ("ALJ") on March 20, 2007.  (R. 93)  Represented by attorney James Balanoff, Norman testified at a hearing before ALJ Joseph P. Donovan, Sr., on October 10, 2007.  (R. 14-58)  Medical expert, Dr. Walter Miller, and vocational expert, Julie Bose, also provided testimony at the hearing.  (R. 16)  The ALJ issued a decision dated February 5, 2008, finding that Norman was not under a disability within the scope of the Social Security Act and therefore not eligible for SSI.  (R. 66-74)  Norman petitioned for review of the ALJ's decision by the Appeals

Council on February 22, 2008, was denied review on March 9, 2009, and subsequently filed a complaint for judicial review in this court on June 10, 2009. (R. 13, 2-4)

Norman, born January 11, 1971, currently is 39 years old and was 34 years old at the onset date of the alleged disability. (R. 18) Norman has achieved a high school diploma. (R. 18) Until his claim for disability in 2005, Norman had worked as a store manager at a sports collectible shop for seven years, from 1990 until 1997, and as a casual decorator for two years, between 1997 and 1999. (R. 128-29) He also had attempted to secure employment as a switchman for a railroad in January of 2005, but he did not complete the required training. (R. 130)

Norman's claim was prompted by a May 20, 2006 emergency room visit where he reported that he had fainted earlier that day, felt weak, and was short of breath. (R. 212) He also stated at the time that he had a physical exam two years prior which showed high blood pressure, proteinuria, and hematuria. (R. 218) CT scans were performed of his brain, abdomen, and pelvis with no remarkable results found. (R. 225-26) Blood tests showed his hemoglobin level at 15.3 and his creatine level at 1.4, both within the normal range, while his Blood Urea Nitrogen (BUN) level was a borderline high 23. (R. 279, 219) The treating emergency room physician, Dr. Dan Kaup, diagnosed Norman with hypertension, syncope, hematuria, and proteinuria, prescribed Altace to treat high blood pressure, and referred him to a urologist. (R. 219-23)

Following his trip to the emergency room, Norman was seen by nephrologist Dr. Venkat Vavilala on June 28, 2006. (R. 180-81) Norman reported that he had been having pain in his abdomen, joint stiffness in the mornings, general fatigue, and occasional fainting spells. (R. 180) Dr. Vavilala's diagnosis was that Norman had uncontrolled hypertension and proteinuria secondary to glomerulonephritis. (R. 181) Further laboratory tests were ordered by Dr. Vavilala

including blood testing and urinalysis. (R. 180) The July 9, 2006 results showed a high concentration of protein in his urine (2792 MG/24 hours), but normal levels for BUN (19 MG/DL) and other blood tests. (R. 182-86)

On September 27, 2006, Norman saw Dr. Herbert White for a consultative examination after a referral from the Disability Determination Office of Indiana. (R. 233-37) Norman informed Dr. White of his previous test results revealing proteinuria, hematuria, and hypertension. (R. 233) He claimed that he previously had been found to have protein in his urine when he was 15 years old, but that no further evaluation of the condition had been made at the time. (R. 233) Norman said that although he was told that he had glomerulonephritis, he had not had a kidney biopsy performed for confirmation because he could not afford it. (R. 233) Further, he reported that in addition to his fainting episode in May 2006, he had lost consciousness again in July 2006 but had not sought medical attention the second time. (R. 233-34) Norman stated that he was suffering from "fatigue, episodes of shortness of breath, tightness in his abdomen, dizziness, abdominal pain and a poor appetite." (R. 233) In his report, Dr. White noted no signs of acute distress in his physical evaluation and mild generalized tenderness in his abdomen. He diagnosed Norman with glomerulonephritis – type undetermined. (R. 234-38)

On review of Dr. White's report, Dr. Richard Wenzler submitted an assessment dated October 12, 2006, of Norman's physical residual functional capacity ("RFC") for the Disability Determination Office. (R. 239-46) He noted that proper exertional limitations for Norman included the following: occasional lifting of 20 pounds; frequent lifting of 10 pounds; stand, walk, or sit for 6 hours out of an 8 hour workday; and push or pull an unlimited amount. (R. 240) Additionally, although Dr. Wenzler noted that while Norman frequently could balance,

stoop, kneel, crouch, and crawl, he only should engage in climbing activities occasionally.  (R. 241)

In November of 2006, Dr. Vavilala ordered follow-up laboratory tests for Norman.  (R. 249-51)  The test results, dated November 27, 2006, showed his BUN and creatine within normal ranges.  (R. 250)  On February 21, 2007, Norman reported to Dr. Vavilala that he was having intermittent dizzy spells and still felt fatigued.  (R. 252)

On February 24, 2007, a physician with the Disability Determination Office, Dr. M. Ruiz, completed a review of Dr. Wenzler's October 12, 2006 report.  (R. 256)  Dr. Ruiz found the report and assessment to be accurate and affirmed it as written.  (R. 256)

Norman saw Dr. Vavilala again on May 23, 2007, for dizziness and fainting spells, reporting that he had not had relief from them since his last visit in February.  (R. 286)  Dr. Vavilala noted that Norman was unable to afford either his medication or testing.  (R. 286)

In an undated letter received by Norman's previous legal counsel on October 8, 2007, Dr. Vavilala declared that Norman suffered from renal insufficiency, nephritic syndrome, and a connective tissue disorder that Dr. Vavilala stated was not able to be fully investigated.  (R. 293)  Dr. Vavilala also stated that Norman's symptoms included extreme fatigue and body and joint pain, and that because of his chronic illness he "seems to be suffering from clinical depression with lack of interest."  (R. 293)  Dr. Vavilala further concluded that Norman was unable to undertake any gainful employment as a result of his tiredness, fatigue, and depression.  (R. 293)

At the October 10, 2007 hearing, Norman testified before ALJ Donoven about his prior work experience and that he was last discharged by the Indiana Harbor Belt Railway for not being able to meet the physical requirements of the training program.  (R. 26-27)  The ALJ questioned Norman about his current condition, capabilities, and limitations.  (R. 19-23)

Norman claimed that he was able to sit for a matter of a couple hours before having to stand or lie down; that he was able to stand for only twenty minutes before he experienced pain in his abdomen around his beltline; and that sometimes he would need to sit down over the course of walking a maximum of a quarter to a half mile. (R. 19) Further, he stated that he was able to carry at most a weight of 50 pounds and that he sometimes had trouble breathing after physical exertion for ten to fifteen minutes. (R. 20-21) Norman's attorney then questioned him about his daily routine and the impacts of his alleged disability. (R. 24-29) Norman testified that he needed to lie down for five hours out of an eight hour day, and that typically three days out of the week he barely could get out of bed. (R. 25, 28) The remaining four days of the week Norman stated that he was able to walk only around his house "doing basically nothing." (R. 28)

Dr. Walter Miller next testified as a medical expert on what his opinion was of Norman's condition and alleged disability. (R. 29-48) He agreed that Norman was suffering from glomerulonephritis as diagnosed by Dr. Vavilala, but he concluded that this instance did not fall under the usual term of nephritic syndrome. (R. 30) He described the situation for someone having nephritic syndrome as retaining excess fluid and lacking the ability to remove such fluid. A person one suffering from nephritic syndrome would require artificial methods to remove the excess fluid, such as dialysis. (R. 30) He further explained that when looking at the blood chemistry of an individual facing kidney problems, doctors should examine the creatine and BUN levels for indications of impaired kidney function. (R. 40-41) Dr. Miller stated that roughly sixty percent of individuals facing the symptoms that Norman described would have a BUN of approximately 40 to 50, and a creatine level of maybe 3 or 4, whereas Norman's levels were 19 and 1.3, respectively. (R. 40-41) He also testified that he would expect a patient to have a normal amount of energy with blood hemoglobin levels in a normal range, such as

Norman's lab results. (R. 40-42) Additionally, Dr. Miller stated that while Norman had protein in his urine, the levels that would be associated with kidney failure typically would be two to three times the numbers that Norman was experiencing. (R. 32) Instead, Dr. Miller asserted that Norman's kidney problem had not reached a point where it seriously was affecting his ability to function. Further, Dr. Miller noted that the pain associated with kidney problems would be localized in the back, as opposed to in the abdomen as Norman described. (R. 33) Accordingly, he concluded that Norman's condition did not meet or equal a listing and that Norman should have the RFC to perform light work with limitations on climbing, crouching, crawling, operation of hazardous machinery, and unprotected heights. (R. 33-35)

The vocational expert, Julie Bose, then testified about Norman's past work experience and a hypothetical individual's prospective ability to function in the workplace. (R. 48-53) She described Norman's work as a casual decorator as medium and unskilled, his work as a store manager as light and semi-skilled, and his training as a railroad switchman as typically medium and semi-skilled. (R. 49) The ALJ proposed a hypothetical individual who occasionally could lift 20 pounds, frequently lift 10 pounds, stand or walk with breaks for six hours in a normal eight hour work day, push and pull an unlimited amount, have no visual limitations, have no gross or fine manipulation limitations, and have ongoing pain and discomfort that would cause the individual to be off task for three to five percent of the work day. (R. 50) Bose stated that this hypothetical individual could not perform work such as Norman's previous employment as a decorator but still could perform light and semi-skilled work as a store manager. (R. 50) Additionally, she stated that there was a wide range of light and unskilled positions in the general workplace that would be available to such an individual, including general office clerk, mail clerk, and laundry folder. (R. 51) The ALJ questioned the vocational expert about the impact

that the proposed three to five percent time off-task would have, and she asserted that there would not be an impact on the general office clerk or laundry folder positions, but that there may be a reduction of the mail clerk position by ten percent.  (R. 52)

Norman's attorney also asked about a hypothetical individual who suffered from tiredness, extreme fatigue and underlying depression, and lacked stamina to the extent that he spent five out of eight hours laying down.  (R. 53)  When asked if such an individual would be able to maintain substantial gainful employment, the vocational expert replied that he would not.  (R. 53)  Additionally, Norman's attorney asked what the vocational impact would be if an individual was unable to maintain an upright, seated position due to abdominal pain, which Bose acknowledged would eliminate sedentary positions altogether.  (R. 53)

On February 5, 2008, the ALJ issued his decision finding Norman not under a disability within the meaning of the Social Security Act.  (R. 66-74)  In reaching his decision, the ALJ applied the five-step evaluation process for determining disability, as established by the Social Security Administration.  (R. 67)  At the first step, the ALJ found that Norman did not engage in substantial gainful activity since June 2, 2006, the date Norman applied for SSI.  (R. 68)  In step two, the ALJ found that Norman was suffering from glomerulonephritis and chronic fatigue and that these conditions significantly impair his ability to perform basic activities.  (R. 68)  At step three, the ALJ found Norman's impairments did not meet or were not medically equal a listed impairment.  (R. 68)  This conclusion was in agreement with opinions on record from consultants designated by the Commissioner, including the medical expert that testified at the October 10, 2007 hearing.  (R. 68)

Applying the fourth step, the ALJ discussed his determination of whether Norman still possessed the RFC to perform his previous relevant work.  (R. 69)  This included a two step

process which required first finding whether there was a medically determinable basis for the claimant's pain or symptoms, and then evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to ascertain to what extent the claimant's ability to work would be limited.  (R. 69)  The ALJ also considered alternative evidence in addition to the objective medical evidence to determine Norman's RFC.  (R. 69)  In his evaluation of the record, the ALJ concluded that Norman had the RFC to perform light work with restrictions on climbing, crawling, working at heights or around moving machinery, and more than occasional crouching. (R. 71)  In coming to this finding, the ALJ discussed Norman's medical history, including his emergency room visit, consultations with Dr. Vavilala, and the state agency medical consultant reports.  (R. 72)  In particular, the ALJ discussed Norman's unremarkable lab tests, rare borderline-high BUN levels, and the medical expert's opinion on the diagnosis of glomerulonephritis with no sign of present kidney failure, as well as the medical expert's questioning of the credibility of the extensive fatigue claimed by Norman.  (R. 70-71).

In analyzing alternative evidence, the ALJ considered Norman's own testimony of his symptoms that he was extremely fatigued, spending five hours laying down out of an eight hour day.  (R. 71)  The ALJ stated that based on the medical expert's opinion and the consistency of the record as a whole, although Norman's general symptoms reasonably could be expected to come from his impairment, he found Norman's claims of the intensity, persistence, and limiting effects of the symptoms to be credible only to the extent that he would be off task three to five percent of the workday.  (R. 70-71)  Norman's treating physician's assessment also was taken into account by the ALJ in his determination, but the ALJ rejected any statements by the physician that would amount to administrative findings, such as whether a claimant was "disabled" or unable to perform a past job.  (R. 72)  The ALJ found Dr. Vavilala's opinion that

Norman could not perform gainful employment due to tiredness, extreme fatigue, or depression not entitled to controlling or great weight because the ALJ stated it was inconsistent with the laboratory results and medical expert's testimony.  (R. 72)  Additionally, the ALJ noted that there was nothing in the record that would substantiate a claim that Norman had been diagnosed or treated for depression.  (R. 72)

With Norman's RFC determined, the ALJ concluded that Norman was able to perform some past relevant work.  (R. 72)  According to the vocational expert, Norman would be able to perform his previous work as a store manager, which was light in exertional demand.  (R. 73)  Such a position would permit Norman to be off task three to five percent of the work day, consistent with the ALJ's determination of Norman's residual functional capacity.  (R. 72-73)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. sec. 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852, (1972)(quoting *Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); s*ee also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th

Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  ***Lopez***, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.   The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  20 C.F.R. 416.920(b).   If he is, the claimant is not disabled and the evaluation process is over.  If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. § 401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  20 C.F.R. §416.920(e).  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish

that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Norman argues that the ALJ's decision was not supported by substantial evidence and should be remanded. Norman asserts that the ALJ failed to give appropriate weight to the evidence of record, did not properly assess Norman's residual functional capacity, and did not correctly consider Norman's credibility according to SSR 96-7p.

First, Norman alleges that the ALJ erred when he did not afford controlling or great weight to Dr. Vavilala's opinion as Norman's treating physician. Norman contends that the opinion of a non-treating source is not entitled as much weight as that of the treating physician and that the ALJ therefore incorrectly gave great weight to the ME's opinion over Norman's treating physician. However, a treating source's opinion is entitled to controlling weight only if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). *See also* SSR 96-2p (explaining same); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)(same); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)(same). Inconsistencies in a treating physician's opinion, whether conflicting internally or with other substantial evidence in the record, may justify denying the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). *See also Clifford v. Apfel*, 227 F.3d 863, 871(7th Cir. 2000)(explaining same). *See, e.g., Schmidt v. Astrue*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for

re-editing or rejecting evidence of disability."); ***Latkowski v. Barnhart***, 93 Fed. Appx. 963, 969 (7th Cir. 2004)(stating same). To that end, when confronted with evidence that is well-supported and contradictory to the treating source, the treating physician's opinion becomes "just one more piece of evidence for the administrative law judge to weigh." ***Hofslien v. Barnhart***, 439 F.3d 375, 377 (7th Cir. 2006).

In his decision, the ALJ considered Dr. Vavilala's opinion but found it was not entitled to controlling or great weight. The ALJ began his discussion of Dr. Vavilala's opinion by noting that Dr. Vavilala's statement about Norman being unable to undertake any gainful employment was not a medical observation, but instead an administrative finding that was dispositive of the case and that such issues were reserved to the Commissioner. Norman asserts that Dr. Vavilala's statement was not conclusory, and that by saying that Norman could not work due to tiredness, fatigue, and depression, Dr. Vavilala correctly had described a functional limitation. The regulations, specifically 20 C.F.R. 416.927(e), reserve dispositive findings to the Commissioner regarding a claimant being "disabled" or "unable to work", as the ALJ correctly noted. Dr. Vavilala's statement did not accurately discuss a functional limitation, but instead presented an opinion of inability to work that was not entitled controlling weight.

The ALJ next weighed the treating physician's opinion based upon the ALJ's review of the record, including the objective medical evidence and the testimony of the medical expert. The ALJ concluded that Dr. Vavilala's opinion stating that Norman could not engage in "gainful employment due to tiredness, extreme fatigue and underlying depression" was inconsistent with the laboratory results and record. In particular, the ALJ found that Norman's hemoglobin levels indicated a normal amount of energy and that the medical expert stated that Norman's kidneys still were functioning normally. The ALJ also discussed in his decision the wide array of other

test results that were included in the record, showing normal ranges for creatine and occasional borderline high BUN levels, as well as an ultrasound of Norman's kidneys and CT scans that showed no remarkable results. Confronted with the disparities between the treating physician's opinion and that of consulting physicians and the rest of the record, it was the ALJ's province to resolve the conflicts. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). After taking into consideration Dr. Vavilala's opinion, the ALJ properly assigned great weight to the medical expert's testimony based on his reasonable explanation that it was more consistent with the record.

Next, Norman argues that the ALJ erred in discounting Dr. Vavilala's statement that Norman could not engage in gainful employment partially due to underlying depression. Norman asserts that he had been diagnosed with clinical depression with a lack of interest and that this was substantiated in Dr. Vavilala's treatment records. However, in reviewing the record, the ALJ correctly observed that there was no evidence to support a diagnosis of depression within Dr. Vavilala's treatment record. In making this observation, the ALJ was following the established procedure for evaluating a disability, specifically analyzing whether Norman had met his burden of showing a severe impairment. *Ellwanger v. Astrue*, 642 F.Supp.2d 891, 898 (7th Cir. 2009) (explaining that claimant bears burden of proof in first four steps of the five-step sequential disability analysis). It is a basic premise that the claimant must provide sufficient records and evidence to substantiate a disability claim. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). In fact, the only mention of depression by Dr. Vavilala appears to be in an undated letter, received in October 2007, which briefly stated that Norman "seems to be suffering from clinical depression." However, this was not found to be a formal diagnosis of depression because Dr. Vavilala never made a note regarding depression in her

actual treatment records.  Norman also argues that the ALJ improperly cited to a lack of treatment for depression, claiming that precedent does not support an ALJ chastising a claimant "with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Regennitter v. Commissioner*, 166 F.3d 1294, 1299-300 (9th Cir. 1999).  Norman later refers to this same argument when questioning the ALJ's assessment of his own credibility.  It is quite clear, though, that the ALJ's decision was not citing Norman himself for failing to seek treatment.  Rather, the ALJ noted that Dr. Vavilala did not prescribe any treatment, medication, or counseling that would have been consistent with a diagnosis of depression.

Finally, Norman contends that the ALJ erred by not obtaining a consultative psychological examination of Norman.  The ALJ does have a duty to obtain a complete record, but this requirement only can be extended so far.  *Scheck*, 357 F.3d at 702.  It always would be possible to obtain another examination or consultation, so the determination of when a record is complete is left to the ALJ's discretion.  *Id.*  A lack of evidence can be demonstrative of a failure to support a claim, as opposed to a record being inadequately developed.  *Simila v. Astrue*, 573 F.3d 503, 516-17 (7th Cir. 2009).   Considering the dearth of evidence in support of Norman's claim of depression, the ALJ reasonably found that Norman had not met his burden of showing depression as a severe impairment.  The ALJ did not fall short in his duty to obtain a complete record but possessed adequate evidence to reach this conclusion.

The next issue Norman raises is that the ALJ's determination that Norman would be off-task for 3-5% of the time was in error.  Norman contests that the 3-5% assessment was speculative and arbitrary and that the ALJ did not provide a rationale for how he reached his decision.  To support his claim, Norman relies upon court decisions that admonish an ALJ for making independent medical findings:  *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996);

*Wilder v. Chater*, 64 F.3d 335, 337-38 (7th Cir. 1995); *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). In the instant case, the ALJ did not come to a medical conclusion on his own with complete disregard to the record as Norman alleges. The ALJ is required to consider the entire record in making his RFC determination, but he is not forced to rely upon any one physician's opinion or choose specifically between the presented opinions. *Schmidt v. Astrue*, 496 F.3d at 845.

The ALJ stated in his decision that he gave careful consideration to Norman's testimony about his fatigue and the impact that it had on his daily activities. The ALJ also discussed the wealth of objective medical evidence, Dr Vavilala's opinion, the State agency's consultation that found Norman had the RFC to perform light work with minimal limitations on climbing, and the testimony of the medical expert, including the ME's opinion that he did not find the extent of Norman's fatigue totally credible. The ALJ contrasted Norman's testimony against the remaining evidence and found Norman's reported fatigue credible to the extent that he would be off-task 3-5% of the time, a permissible finding given the ALJ's proper assessment of the record. *See, e.g., Scott v. Astrue*, 2010 WL 1640193, *15 (N.D. Ill. Apr. 22, 2010)(affirming ALJ's determination that the claimant may be off-task 10% of the time after finding the claimant's statements regarding the intensity, persistence, and limiting effects of her impairment to be not entirely credible).

Norman's final contention is that the ALJ was incorrect in evaluating his credibility. Norman asserts that the ALJ offered only a vague finding that he was not entirely credible, and the ALJ therefore committed reversible error. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d at 843; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of

fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872.

Norman cites precedent criticizing ambiguous credibility findings that use phrases such as "not particularly credible" and provide little explanation. *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006). However, such phrases are permissible so long as they are "not used in a vacuum but supported in the ALJ's decision." *Scott v. Astrue*, No. 08 C 5882, 2010 WL 1640193, at *11 (N.D.Ill Apr. 22, 2010). The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimaint's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007)("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck*, 357 F.3d at 703. If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and

statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). However, in evaluating a claimant's subjective complaints of pain, the Seventh Circuit instructs:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (internal citations omitted). *See also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001)(quoting same).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2; s*ee Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872).

In the instant case, the ALJ began by stating that he found that Norman's symptoms reasonably could be expected to stem from his medically determinable impairment but that the ALJ found Norman's claims concerning the intensity, persistence, and limiting effects of the symptoms to be "not entirely credible." Norman contends that the ALJ recited an incomplete version of the medical history and therefore did not provide an adequate and logical rationale for this conclusion in his written decision. The ALJ, however, methodically analyzed Norman's medical history and all relevant aspects of his claim included in the record. The ALJ discussed the results of laboratory testing performed when Norman visited the emergency room as well as the results from testing ordered by Dr. Vavilala. The ALJ noted that there were no abnormal CT scans or ultrasounds and that the laboratory tests revealed BUN and creatine levels typically in the normal range, with the exception of a borderline high BUN level at the emergency room in May of 2006. Dr. Vavilala's treatment records and opinion were examined, including the diagnosis of glomerulonephritis based on the presence of protein in Norman's urine. The ALJ additionally discussed consultative examinations by Dr. White and by the State agency's physician and their findings. The ALJ's decision devoted considerable discussion to evaluating the medical expert's testimony and opinion, which agreed with Dr. Vavilala's diagnosis of

glomerulonephritis.  However, the ALJ noted that the medical expert did not believe that Norman had nephritic syndrome and that Norman's kidneys had not shown signs of failure. Additionally, the ALJ observed that the medical expert found neither Norman's claims of extreme fatigue nor Dr. Vavilala's letter asserting Norman incapable of working to be consistent with the record.  Finally, the ALJ considered Norman's testimony regarding his fatigue – that he spent five hours out of an eight hour day lying down, could stand for only 20 minutes, walk only a quarter to a half mile, lift up to 50 pounds, and sit for a couple of hours before having to stand or lie down.

After this comprehensive consideration of the record and all relevant testimony, the ALJ concluded that he shared the opinion of the medical examiner, finding it to be the most consistent with the record in its entirety.  In reaching this determination, the ALJ had thoroughly scrutinized the record as a whole and found Norman's allegations as to the intensity, persistence, and limiting effects of his symptoms against the weight of evidence.  Accordingly, the ALJ stated that he had given great weight to the medical expert's opinion, whereas he afforded limited weight to Norman's testimony which he found credible only to the extent that Norman would be off-task for 3-5% of the workday.  It is apparent that the ALJ came to this conclusion after careful consideration of the record, and there is ample support provided in his decision to provide a logical bridge to his final assessment.

_____

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED This 13th Day of August, 2010.

/s/ Andrew P. Rodovich
United States Magistrate Judge